Slip Op. 19-60

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ARLANXEO USA LLC and ARLANXEO BRASIL S.A., | |
| **Plaintiffs,** | |
| and | |
| INDUSTRIAS NEGROMEX, S.A. DE C.V., INSA, LLC, KUMHO PETROCHEMICAL CO., LTD., and SYNTHOS S.A., | |
| **Consolidated Plaintiffs,** | Before: Jennifer Choe-Groves, Judge |
| v. | Consol. Court No. 17-00247 |
| UNITED STATES and UNITED STATES INTERNATIONAL TRADE COMMISSION, | |
| **Defendant,** | |
| and | |
| LION ELASTOMERS LLC, | |
| **Defendant-Intervenor.** | |

## OPINION

[Sustaining the U.S. International Trade Commission's final affirmative material injury determination in the antidumping duty investigation of emulsion styrene-butadiene rubber from Brazil, Mexico, the Republic of Korea, and Poland.]

Dated: May 17, 2019

Kenneth G. Weigel, Alston & Bird, LLP, of Washington, D.C., argued for Plaintiffs Arlanxeo USA LLC and Arlanxeo Brasil S.A.  With him on the briefs was Chunlian Yang.

William C. Sjoberg, Porter, Wright, Morris & Arthur, LLP, of Washington, D.C., argued for Consolidated Plaintiffs Industrias Negromex, S.A. de C.V. and INSA, LLC.

Jarrod M. Goldfeder, Trade Pacific, PLLC, of Washington, D.C., for Consolidated Plaintiff Kumho Petrochemical Co., Ltd.  With him on the briefs was Aqmar Rahman.

Jill A. Cramer, Mowry & Grimson, PLLC, of Washington, D.C., for Consolidated Plaintiff Synthos S.A.  With her on the briefs were Jeffrey S. Grimson and Yuzhe PengLing.  Bryan P. Cenko, James C. Beaty, Kristin H. Mowry, and Sarah M. Wyss also appeared.

Jane C. Dempsey, Attorney, Office of General Counsel, U.S. International Trade Commission, of Washington, D.C., argued for Defendant U.S. International Trade Commission.  With her on the brief were Dominic Bianchi, General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation.

Matthew T. McGrath, Barnes, Richardson & Colburn, LLP, of Washington, D.C., argued for Defendant-Intervenor Lion Elastomers LLC.


Choe-Groves, Judge:  This consolidated action challenges the final affirmative material injury determination issued by the U.S. International Trade Commission ("Defendant," "ITC," or "Commission") in the antidumping duty investigation of emulsion styrene-butadiene rubber ("ESBR") from Brazil, Mexico, the Republic of Korea ("Korea"), and Poland.  See Emulsion Styrene-Butadiene Rubber From Brazil, Korea, Mexico, and Poland, 82 Fed. Reg. 43,402 (Int'l Trade Comm'n Sept. 15, 2017); see also Emulsion Styrene-Butadiene Rubber from Brazil, Korea, Mexico, and Poland, USITC Pub. 4717, Inv. Nos. 731-TA-1334-1337 (Aug. 2017), available at https://www.usitc.gov/publications/701_731/pub4717.pdf (last visited May 14, 2019) ("Final ITC Determination").  Before the court are two Rule 56.2 Motions for Judgment on the Agency Record filed by Arlanxeo USA LLC, Arlanxeo Brasil S.A., Industrias Negromex, S.A. de C.V., INSA, LLC, Kumho Petrochemical Co., Ltd., and Synthos S.A.  See Joint Mot. J. Agency R. Pursuant USCIT Rule 56.2 Pls. Arlanxeo USA LLC & Arlanxeo Brasil S.A., &

Consol. Pls. Industrias Negromex, S.A. de C.V., INSA, LLC, Kumho Petrochemical Co., Ltd., &

Synthos S.A., Apr. 30, 2018, ECF No. 46; Mot. J. Agency R. Pursuant Rule 56.2 Consol. Pl.

Synthos S.A. Issue Negligibility, Apr. 30, 2018, ECF No. 42.  For the following reasons, the

court sustains the Commission's final affirmative material injury determination.

## ISSUES PRESENTED

The court reviews the following issues:

1.    Whether the Commission's finding regarding the volume of subject imports was

        supported by substantial evidence;

2.    Whether the Commission's finding regarding price effects was supported by

        substantial evidence and in accordance with the law;

3.    Whether the Commission's finding regarding the impact of subject imports was

        supported by substantial evidence and in accordance with the law; and

4.    Whether the Commission's determination that Poland was not a negligible source

        of subject imports was supported by substantial evidence and in accordance with

        the law.

## PROCEDURAL HISTORY

Lion Elastomers LLC ("Lion") and East West Copolymer, LLC filed antidumping duty

petitions with the U.S. Department of Commerce ("Department" or "Commerce") and the ITC

on July 21, 2016, alleging that the domestic industry had been materially injured or threatened

with material injury from imports of ESBR from Brazil, Korea, Mexico, and Poland.  See

Emulsion Styrene-Butadiene Rubber from Brazil, Korea, Mexico, and Poland, USITC Pub. 4636

at I-1, Inv. Nos. 731-TA-1334-1337 (Preliminary) (Sept. 2016).  Commerce and the ITC

instituted antidumping duty investigations.  See id.

       Commerce completed its antidumping duty investigations of the four subject countries

and published its final determinations on July 19, 2017.  See Emulsion Styrene-Butadiene

Rubber From Brazil, 82 Fed. Reg. 33,048 (Dep't Commerce July 19, 2017) (final affirmative

determination of sales at less than fair value and final negative determination of critical

circumstances) ("Brazil AD Final Determination"); Emulsion Styrene-Butadiene Rubber From

the Republic of Korea, 82 Fed. Reg. 33,045 (Dep't Commerce July 19, 2017) (final affirmative

determination of sales at less than fair value, and final affirmative determination of critical

circumstances, in part) ("Korea AD Final Determination"); Emulsion Styrene-Butadiene Rubber

From Mexico, 82 Fed. Reg. 33,062 (Dep't Commerce July 19, 2017) (final affirmative

determination of sales at less than fair value) ("Mexico AD Final Determination"); Emulsion

Styrene-Butadiene Rubber From Poland, 82 Fed. Reg. 33,061 (Dep't Commerce July 19, 2017)

(final affirmative determination of sales at less than fair value) ("Poland AD Final

Determination").  In the Brazil investigation, Commerce found that the subject imports of ESBR

were being sold at less than fair value and calculated a final dumping margin of 19.61 percent.

See Brazil AD Final Determination, 82 Fed. Reg. at 33,048.  Commerce found also that the

subject imports of ESBR were being sold at less than fair value in the Korea, Mexico, and

Poland investigations and calculated final dumping margins of 9.66 percent to 44.30 percent,

19.52 percent, and 25.43 percent, respectively.  See Korea AD Final Determination, 82 Fed. Reg.

at 33,046; Mexico AD Final Determination, 82 Fed. Reg. at 33,063; Poland AD Final

Determination, 82 Fed. Reg. at 33,062.

The ITC published its final affirmative material injury determination on August 3, 2017.
See Emulsion Styrene-Butadiene Rubber From Brazil, Mexico, Korea, and Poland, 82 Fed. Reg.
at 43,402.  The ITC held a public hearing on June 29, 2017, see Final ITC Determination at I-1,
and received pre-hearing and post-hearing briefs from the relevant parties.  See id. at 3.  The
Commission received questionnaire data from 15 importers accounting for 100 percent of
imports of subject ESBR from Brazil, 92.2 percent of imports of subject ESBR from Korea, 100
percent of imports of subject ESBR from Mexico, 99.9 percent of imports of subject ESBR from
Poland, and 79.5 percent of imports of ESBR from non-subject countries during the final year of
investigation.  See id. at 4.  The ITC held a public hearing on June 29, 2017, see id. at I-1, and
received pre-hearing and post-hearing briefs from relevant parties.  See id. at 3.  The period of
investigation spanned from January 2014 through March 2017. See id. at 24.

An evenly-divided Commission determined that an industry in the United States had been
materially injured by reason of imports of ESBR from Brazil, Korea, Mexico, and Poland that
Commerce found to be sold at less than fair value.  See id. at 3, 12.  As a result, Commerce
published antidumping duty orders on subject imports from the four subject countries on
September 12, 2017.  See Emulsion Styrene-Butadiene Rubber from Brazil, the Republic of
Korea, Mexico, and Poland: Antidumping Duty Orders, 82 Fed. Reg. 42,790 (Dep't Commerce
Sept. 12, 2017) ("Antidumping Duty Orders").

The Commission commenced its injury analysis by defining the domestic product that is
like or most similar to the imported ESBR and identifying the industry responsible for producing
the domestic like product.  See Final ITC Determination at 4–8.  ESBR is predominantly used in
the production of car and light truck tires, as well as in a variety of non-tire products, including

conveyor belts, shoe soles, hoses, roller coverings, and flooring.  See id. at 6.  The Commission's

definition of the domestic like product was coterminous with the scope of the imported ESBR

under investigation by Commerce.  See id. at 7.  "The scope of these investigations covers grades

of ESBR included in the [International Institute of Synthetic Rubber Producers] 1500 and 1700

series of synthetic rubbers. . . .  The Commission consequently defined a single domestic like

product, consisting of the 1500 and 1700 series ESBR, a product category that was coextensive

with the scope [set by Commerce]."  See id. at 5–7.  The Commission found that the domestic

industry includes all U.S. producers of the domestic like product.  See id. at 8.

 The Commission assessed the market conditions of the domestic ESBR industry in its

analysis of material injury by reason of subject imports.  See id. at 12–31.  The Commission

found that apparent domestic consumption of ESBR declined over the period of investigation.

See id. at 17.  The Commission noted that demand for ESBR is "generally driven by the demand

for tires, primarily demand for replacement tires and to a lesser degree for tires that original

equipment manufacturers [ ] mount on new vehicles."  Id.  A "reduced demand for end-use

products, such as replacement tires, off-the-road tires, and conveyor belts" and an increase in the

use of solution styrene-butadiene rubber ("SSBR") in place of ESBR were provided as reasons

for the decline in demand.  Id.  The cost of raw materials used to produce ESBR, including

styrene and butadiene, declined from January 2014 to December 2016, but increased from

December 2016 to March 2017.  See id. at 19–20.  The domestic industry was the largest

supplier of ESBR to the U.S. market during the period of investigation, and cumulated subject

imports from the four subject countries were the second largest source of supply.  See id. at 18.

Cumulated subject imports held a market share of approximately 20 percent during the period of

investigation.  See id. at 20.  The Commission determined that there was a moderate to high

degree of substitutability between domestically produced ESBR and the subject imports.  See id.

at 19.  "[T]he 1500 and 1700 series ESBR are manufactured according to [International Institute

of Synthetic Rubber Producers] industry specifications.  Moreover, a majority of responding U.S.

producers and purchasers reported that ESBR imports from the subject countries are 'always' or

'frequently' interchangeable with each other and with the domestic like product."  See id.

        The Commission then considered the volume of cumulated subject imports, price effects

of cumulated subject imports, and the impact of cumulated subject imports on the domestic

industry.  See id. at 20–31.  The Commission found that although the quantity and market share

of cumulated subject imports decreased from 2014 to 2016, said imports remained at "elevated

levels in the U.S. market in 2015 and 2016."  See id. at 21.  "[E]ven though demand declined and

[domestic production recovered from supply disruption], cumulated subject imports did not

meaningfully retreat from the U.S. market during the period of investigation."  See id.  The

Commission found that the volume of cumulated subject imports was significant "on an absolute

basis and relative to apparent U.S. consumption."  See id.  Subject imports undersold the

domestic like product and depressed U.S. producer prices to a significant degree.  See id. at 22–

24.  The Commission recognized that while other factors contributed to the downward trend in

prices, including a decline in cost for raw materials, "these cannot explain the magnitude of the

declines in prices of the domestic like product."  See id. at 24.  The Commission determined that

the "significant volume of low-priced cumulated subject imports put pressure on the domestic

industry to reduce prices."  See id. at 25.  The Commission noted that cumulated subject imports

from the four subject countries had a significant impact on the domestic industry, resulting in

declines in production, capacity utilization, U.S. shipments, and net sales revenues as well as

fluctuations in industry employment, wages, and productivity.  See id. at 27–31.

The Commission concluded that the domestic industry was materially injured by reason

of subject imports of ESBR from Brazil, Korea, Mexico, and Poland that were sold in the U.S. at

less than fair value.  See id. at 34.  Accordingly, Commerce issued antidumping duty orders on

ESBR from the four subject countries.  See Antidumping Duty Orders.

Plaintiffs Arlanxeo USA LLC and Arlanxeo Brasil S.A. (collectively, "Plaintiffs") and

Consolidated Plaintiffs Industrias Negromex, S.A. de C.V. ("Industrias"), INSA, LLC, Kumho

Petrochemical Co., Ltd., and Synthos S.A. (collectively, "Consolidated Plaintiffs") initiated

multiple actions challenging the ITC's final affirmative determination of material injury, which

the court consolidated.  See Order, Feb. 9, 2018, ECF No. 35.  The court denied Defendant's

motion to dismiss Industrias' complaint and granted Industrias' cross-motion for leave to

construe the summons and complaint as concurrently-filed.  See Arlanxeo USA LLC v. United

States, 42 CIT __, 337 F. Supp. 3d 1350 (2018).

Plaintiffs and Consolidated Plaintiffs filed a Rule 56.2 motion challenging various

aspects of the Final ITC Determination.  See Joint Mot. J. Agency R. Pursuant USCIT Rule 56.2

Pls. Arlanxeo USA LLC & Arlanxeo Brasil S.A., & Consol. Pls. Industrias Negromex, S.A. de

C.V., INSA, LLC, Kumho Petrochemical Co., Ltd., & Synthos S.A., Apr. 30, 2018, ECF No. 46;

see also Pls.' & Consol. Pls.' Mem. Supp. Joint Mot. J. Agency R. Under USCIT Rule 56.2, Apr.

30, 2018, ECF No. 46 ("Pls. Br.").  Consolidated Plaintiff Synthos S.A. ("Synthos") filed a Rule

56.2 motion challenging the ITC's negligibility determination regarding Poland.  See Mot. J.

Agency R. Pursuant Rule 56.2 Consol. Pl. Synthos S.A. Issue Negligibility, Apr. 30, 2018, ECF

No. 42; see also Mem. P. & A. Supp. Mot. J. Agency R. Pursuant Rule 56.2 Pl. Synthos S.A.

Issue Negligibility, Apr. 30, 2018, ECF No. 45 ("Synthos Br."). The court held oral argument on

March 6, 2019. See Closed Oral Argument, Mar. 6, 2019, ECF No. 70.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012) and Section

516A(a)(2)(B)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(ii), which

grant the court authority to review actions contesting the ITC's final affirmative injury

determination following an antidumping or countervailing duty investigation. The court will

uphold the ITC's determinations, findings, or conclusions unless they are unsupported by

substantial evidence on the record, or otherwise not in accordance with the law. 19 U.S.C.

§ 1516a(b)(1)(B)(i); see also Siemens Energy, Inc. v. United States, 806 F.3d 1367, 1369 (Fed.

Cir. 2015). The possibility of drawing two inconsistent conclusions from the evidence does not

prevent the court from holding that the Commission's determinations, findings, or conclusions

are supported by substantial evidence. See Nippon Steel Corp. v. United States, 458 F.3d 1345,

1352 (Fed. Cir. 2006) (citing Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed.

Cir. 2001)); see also Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

## ANALYSIS

### I.    Legal Framework

In order to make an affirmative material injury determination, the ITC must find that

(1) material injury existed and (2) the material injury was caused by reason of the subject

imports. See Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (quoting

Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997)). Material injury is

defined by statute as harm that is not inconsequential, immaterial, or unimportant.  19 U.S.C.

§ 1677(7)(A).  To determine whether a domestic industry has been materially injured or

threatened with material injury by reason of unfairly subsidized or less than fair value imports,

the Commission considers:

>  (I)     the volume of imports of the subject merchandise,
>
>  (II)    the effect of imports of that merchandise on prices in the United States for
>          domestic like products, and
>
>  (III)   the impact of imports of such merchandise on domestic producers of
>          domestic like products, but only in the context of production operations
>          within the United States.

Id. § 1677(7)(B)(i).  The Commission may consider such other economic factors as are relevant

to the determination regarding whether there is material injury by reason of imports.  Id.

§ 1677(7)(B)(ii).  No single factor is dispositive and the significance to be assigned to a

particular factor is for the ITC to decide.  See S. Rep. No. 96-249, at 88 (1979), reprinted in 1979

U.S.C.C.A.N. 381, 474.

        The statute neither defines the phrase "by reason of" nor provides the ITC with guidance

on how to determine whether the material injury is by reason of subject imports.  The Court of

Appeals for the Federal Circuit has interpreted the "by reason of" statutory language to require

the Commission to consider the volume of subject imports, their price effects, their impact on the

domestic industry, and to establish whether there is a causal connection between the imported

goods and the material injury to the domestic industry.  See Swiff-Train Co., 793 F.3d at 1361;

see also S. Rep. No. 96-249, at 57–58, 74–75 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 443–

44, 460–61.

## II.   The Parties' Challenges to the Commission's Final Affirmative Material Injury Determination

Plaintiffs dispute various findings made by the Commission that contributed to the final affirmative material injury determination.  The court addresses each finding in turn.

### A.  The Commission's Volume Determination

The ITC is required to consider the volume of subject imports in determining whether a domestic industry has been materially injured.  See 19 U.S.C. § 1677(7)(C)(i).  When evaluating volume, the Commission must consider "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  Id. § 1677(7)(C)(i); see also Nucor Corp. v. United States, 414 F.3d 1331, 1335 (Fed. Cir. 2005).  The statute does not define what is considered "significant" because "[f]or one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant."  See S. Rep. No. 96–249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.  The court will uphold the Commission's volume determination unless it is unsupported by substantial evidence in the record.  See Siemens Energy, Inc., 806 F.3d at 1369 (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

The Commission found that the volume of cumulated subject imports was significant on an absolute basis and relative to apparent U.S. consumption.  Final ITC Determination at 21.  The cumulated subject imports held a market share of approximately 20 percent during the period of investigation.  Id. at 20.  The volume of cumulated subject imports increased from 2013 to 2014, after Lion closed its Baton Rouge plant in December 2013, and decreased between 2014 and 2016.  See id. at 21.  The Commission noted that after the plant reopened in April 2014

and U.S. consumption declined, the cumulated subject imports remained at elevated levels in the

U.S. market in 2015 and 2016.  See id.  The Commission stated that the oversupply of ESBR in

the global market contributed to the attractiveness of the U.S. market for the subject imports.

See id.  The Commission found that the domestic industry had sufficient capacity to supply

apparent U.S. consumption during the period of investigation.  Id. at 21 n.115.

Plaintiffs contend that the Commission failed to consider "the context and conditions of

competition here," specifically that purchasers bought the subject imports in order to ensure an

"available *i.e.* secure, and reliable supply during a chaotic period for the domestic industry" due

to supply disruptions after the Baton Rouge plant closed.  See Pls. Br. 8–10.  Plaintiffs' argument

fails because the Commission did consider the "context and conditions of competition here."

After the Baton Rouge plant closed, the volume of cumulated subject imports increased, and

after the plant reopened, demand declined.  Final ITC Determination at 21.  The Commission

observed that after the plant reopened, the "cumulated subject imports did not meaningfully

retreat from the U.S. market."  See id.  The Commission found also that the oversupply of ESBR

in the global market contributed to the attractiveness of the U.S. market, thus the plant closure

was not the sole reason for the increase in imports.  See id.  Because the Commission did

consider the supply disruptions in its volume analysis and other conditions of competition such

as the oversupply of ESBR in the global market, the court concludes that the Commission's

volume determination is supported by substantial evidence.

### B.  The Commission's Price Effects Determination

In evaluating the effect of imports on prices, the statute directs the Commission to

consider whether:

(I)     there has been significant price underselling by the imported merchandise
        as compared with the price of domestic like products of the United States,
        and

(II)    the effect of imports of such merchandise otherwise depresses prices to a
        significant degree or prevents price increases, which otherwise would have
        occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

### 1. Underselling

The Commission found widespread underselling of the domestic like product by subject

imports based on evidence that the subject imports undersold the domestic like product in 150 of

218 quarterly price comparisons and 85.6 percent of the quantity of subject imports covered by

the pricing data was sold during quarters in which the average price of these imports was less

than that of the comparable domestic product.  See Final ITC Determination at 22–23.  The

Commission also addressed the argument that the pricing data for some products was skewed

because of a "swap" agreement between Arlanxeo and Goodyear Tire & Rubber Company

("Goodyear"), in which Arlanxeo received U.S.-produced ESBR in exchange for its Brazil-

produced ESBR on a pound for pound basis at an artificial price.  See id. at 23.  The Commission

found that the "swap" price was the result of a negotiation between two unrelated companies and

thus declined to revise the pricing date.  See id.

Plaintiffs contend that the Commission's underselling analysis is flawed because the

Commission based its analysis on the pricing trends between January 2014 and December 2016

and overlooked the fact that domestic prices increased over the period of investigation, including

the first quarter of 2017.  See Pls. Br. 14–15.  Plaintiffs argue that the Commission did not

properly analyze the causal nexus between subject imports and domestic prices because it failed

to consider other factors on prices such as demand declines, raw material cost fluctuations, and

the intensification of domestic competition.  See Pls. Br. 19; Pls. Reply 10.[1]  Plaintiffs argue also

that the Commission improperly considered the artificial swap price between Arlanxeo and

Goodyear rather than the market price of the ESBR in the Commission's injury finding.  See Pls.

Br. 24.

      Plaintiffs' first two arguments conflate the Commission's analysis of underselling and

price depression.  Section 1677(7)(C)(ii)(II) requires the Commission to undertake two distinct

analyses.  Underselling involves a comparison of the "price of domestic like products of the

United States" and the "imported merchandise."  19. U.S.C. § 1677(7)(C)(ii)(I).  The

Commission properly undertook its underselling analysis by comparing prices from January

2014 through March 2017.  See Final ITC Determination at Table V-10.  Plaintiffs' first

argument that the Commission overlooked pricing data from the first quarter of 2017 is related to

the Commission's price depression analysis.  See id. at 24 ("Our analysis of price depression

focuses on movements in quarterly prices for the domestic like product and subject imports

between January 2014 and December 2016.").  Plaintiff's second argument relates to the

Commission's price depression analysis rather than its underselling analysis because the "causal

nexus" between subject imports and domestic prices is related to "the effect of imports of such

---

[1]At a closed oral argument, Plaintiffs raised a new, additional argument regarding price and underselling in support of their contention that the Commission improperly analyzed the causal nexus.  See Closed Oral Argument, Mar. 6, 2019, ECF No. 70.  Plaintiffs failed to raise this argument in their opening brief and the court thus deems the argument waived.  See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

merchandise" under 19 U.S.C. § 1677(7)(C)(ii).  Because the Commission's underselling

analysis was distinct from its price depression analysis, the court concludes that the

Commission's underselling analysis is in accordance with the law.

      Plaintiffs' argument regarding the "swap" price is relevant to the Commission's

underselling analysis.  The Commission addressed the "swap" price in its analysis and declined

to revise the pricing data as "the price of the swap sales was negotiated between two unrelated

companies."  See Final ITC Determination at 23.  The Commission is required to compare the

prices of subject imports to the domestic like product.  See 19. U.S.C.§ 1677(7)(ii)(II).  The

Commission is not required to compare the "market price" of subject imports to the domestic

like product, nor is the Commission required to revise the pricing data because Goodyear and

Arlanxeo negotiated a swap price "higher than the actual market price."  See Final ITC

Determination at 23.  The Commission fulfilled its statutory obligation by using Goodyear's

reported price for the swap transactions.  Because the Commission did not have to revise the

swap price, the court finds that the Commission's use of the swap price in its underselling

analysis is in accordance with the law.

      **2.  Price Depression**

      The Commission found that the subject imports depressed U.S. producers' prices to a

significant degree.  Id. at 24.  The Commission's analysis focused on quarterly prices between

January 2014 and December 2016 and acknowledged that prices for the domestic products "rose

sharply during the first quarter of 2017."  See id. at 24 n.132.  The Commission did not include

this data in its analysis because there were "anomalous conditions during this quarter, as it

reflected a period when raw material costs spiked."  See id.  Prices, demand, and raw material

costs declined from January 2014 to December 2016 for all products.  See id. at 24.  The

Commission observed that "despite declining demand, the volume of cumulated subject imports

remained at significant levels."  Id.  The Commission found that the significant volume of

imports put pressure on the domestic industry to reduce prices by lowering the fixed conversion

fee, which covers producers' other material costs, fixed overhead costs, and a profit margin in

the contract pricing formulas.  See id. at 20, 25.  The Commission acknowledged the intra-

industry competition between producers, but found that this argument failed because of the

"price transparency in this market" and that it was the presence of the imports in the market that

caused the price depression.  See id. at 26.

    Plaintiffs contend that the Commission's determination is unsupported by substantial

evidence because it failed to consider the decline of subject import volume and market share in

its price depression analysis.  See Pls. Br. 24–26.  Plaintiffs argue that the Commission's price

depression analysis is based on an unreasonable interpretation of record evidence because the

tables and figures cited by the Commission do not illustrate a causal nexus between the prices of

the subject imports and the prices of the domestic industry, and the Commission did not consider

how the domestic supply shortage caused by the shutdown of the Baton Rouge plant in

December 2013 affected downward pricing pressure.  Id. at 26–29.

    The statute directs the Commission to consider the effect of imports and whether the

imports depress prices to a significant degree, and the imports need not be the sole cause of the

price depression.  See 19 U.S.C. § 1677(7)(C)(ii); Hyundai Elecs. Indus. Co. v. United States, 21

CIT 481, 486 (1997).  Plaintiffs' arguments thus fail.  First, the Commission addressed the

decline of subject import volume and market share in its analysis, but found that the "volume of

cumulated subject imports is significant on an absolute basis and relative to apparent U.S. consumption." <u>See</u> <u>Final ITC Determination</u> at 21.  Second, the prices of the subject imports need not be the sole cause of the price depression but should depress prices or prevent price increases "to a significant degree."  <u>See</u> 19 U.S.C. § 1677(7)(C)(ii).  The Commission explained that although "other factors contributed to the downward trend in prices, these cannot explain the magnitude of the decline in prices of the domestic like product."  <u>See</u> <u>Final ITC Determination</u> at 24.  The Commission did not explicitly make a finding regarding any supply shortage caused by the plant closure in its price depression analysis, but it need not do so.  <u>See</u> <u>Calabrian Corp. v. United States Int'l Trade Comm'n</u>, 16 CIT 342, 350, 794 F. Supp. 377, 385 (1992) (The Commission "is not required to make explicit findings with respect to all factors considered.") Because the Commission considered the volume and market share of the subject imports in its price depression analysis, the court concludes that this analysis is supported by substantial evidence.

Plaintiffs contend also that the Commission's conclusion that the subject imports depressed the conversion fee was contradicted by record evidence.  <u>See</u> Pls. Br. 29–34.  During the period of investigation, purchasers informed domestic suppliers their prices were higher than subject imports and requested that the suppliers meet the subject import prices and in order to do so, purchasers negotiated cuts in the fixed conversion fee.  <u>See</u> <u>Final ITC Determination</u> at 25–26.  Record evidence thus supports the Commission's conclusion.  The court finds that the Commission's conclusion that the subject imports depressed the conversion fee is supported by substantial evidence.

## C.  The Commission's Impact Determination

As part of its material injury analysis, the Commission must consider "the impact of

[subject imports] on domestic producers of domestic like products, but only in the context of

production operations within the United States."  19 U.S.C. § 1677(7)(B)(i)(III).  The statute

specifies a number of factors that are relevant in determining whether subject imports have had

an adverse impact on domestic producers:

> (I)     actual and potential decline in output, sales, market share, gross profits,
>         operating profits, net profits, ability to service debt, productivity, return on
>         investments, return on assets, and utilization of capacity,
>
> (II)    factors affecting domestic prices,
>
> (III)   actual and potential negative effects on cash flow, inventories, employment,
>         wages, growth, ability to raise capital, and investment,
>
> (IV)    actual and potential negative effects on the existing development and
>         production efforts of the domestic industry, including efforts to develop a
>         derivative or more advanced version of the domestic like product, and
>
> (V)     in a proceeding under part II of this subtitle, the magnitude of the margin of
>         dumping.

Id. § 1677(7)(C)(iii).  The Commission is directed to "evaluate all relevant economic factors . . .

within the context of the business cycle and conditions of competition that are distinctive to the

affected industry."  Id.  No single factor is dispositive and "the significance to be assigned to a

particular factor is for the ITC to decide."  See S. Rep. No. 96–249, at 88 (1979), reprinted in

1979 U.S.C.C.A.N. 381, 474.

Plaintiffs contest the Commission's final determination that the subject imports had a

significant impact on the domestic industry, and argue that the determination was not supported

by substantial evidence and otherwise not in accordance with the law.  See Pls. Br. 34.

Plaintiffs' chief complaint is that the Commission erred by failing to consider their cost-price

squeeze argument, i.e., that it was Lion's own business decisions, not the subject imports, that

caused the cost-price squeeze in the domestic market.  See id. at 36–43.  In other words,

Plaintiffs contend that the underselling and alleged price depression associated with subject

imports were not the sources of the domestic industry's poor condition.  See id. at 44.

The Commission "acknowledge[d] that intra-industry competition existed during the

period of investigation," but found that "such competition d[id] not explain the significant

volume of cumulated subject imports, the significant underselling of the domestic like product by

cumulated subject imports, and the significant price depression caused by the cumulated subject

imports during this time period."  Final ITC Determination at 30.  The Commission adequately

addressed the intra-industry competition and its analysis is supported by substantial evidence.

The Commission is not required to focus on one portion of the industry by making a

disaggregated analysis of material injury and thus did not have to focus its intra-industry

competition analysis at a granular level specific to the business data of Lion.  See Calabrian

Corp., 16 CIT at 350, 794 F. Supp. at 385.  The court concludes, therefore, that the

Commission's impact determination also is in accordance with the law.

## III.     Negligibility

Imports are negligible "if such imports account for less than 3 percent of the volume of

all such merchandise imported into the United States in the most recent 12–month period for

which data are available that precedes the filing of the petition."  19 U.S.C. § 1677(24)(A)(i)(I)

(emphasis added).  The Commission "may make reasonable estimates on the basis of available

statistics" of the relevant import levels for purposes of deciding negligibility.  Id. § 1677(24)(C).

If the Commission determines that imports of the subject merchandise are negligible, the

investigation terminates with respect to those imports.  See id. § 1673d(b)(1).

Synthos contests the Commission's determination that Poland was not a negligible source

of ESBR imports and Poland's inclusion in the Commission's affirmative injury determination.

See Synthos Br. 2.  Synthos contends that the Commission's determination was unsupported by

substantial evidence and not in accordance with the law because the Commission did not retrieve

import data from the proprietary Customs records for two of the four tariff classifications (HTS

numbers 4002.19.0016 and 4002.60.0000) under which ESBR entered the United States, thus

underestimating the total imports of ESBR and overinflating Poland's share of imports.  See id.

at 7–8.  The Commission explained its methodology, stating that U.S. import data "are based on

importer questionnaire responses that have been supplemented with official Commerce import

statistics on imports entering under HTS number 4002.19.0015 and, for Korea only, also under

HTS 4002.19.0019."  Final ITC Determination at 9 n.38.  The questionnaire data accounted for

100 percent of subject imports from Brazil in 2016, 92.2 percent of imports of subject

merchandise from Korea, 100 percent of subject imports from Brazil in 2016, 92.2 percent of

subject imports from Poland, and 79.5 percent of imports of ESBR from nonsubject countries.

Id.  The Commission reasoned that "[r]elying on such data supplemented with official import

statistics provides a more accurate measure of total imports" because the merchandise imported

under the two other classification headings (HTS numbers 4002.19.0016 and 4002.60.0000) was

done in error.  Id.  The questionnaire responses included the misclassified ESBR.  See id. at IV-1

n.3 ("Other than imports under HTS number 4002.19.0015, two firms reported importing under

HTS number 4002.19.0019, one firm under 4002.19.0016, and one firm under 4002.60.0000.").

The Commission "rel[ied] on [this] data." Id. at 9 n.38.  Because the Commission's analysis

included the misclassified ESBR that entered under the two tariff classifications at issue, it did

not need to include all imports that entered under those classifications.  The court finds that the

Commission's negligibility determination is supported by substantial evidence because it

included the misclassified ESBR.  The Commission did not need to retrieve the import data from

the proprietary Customs records for all tariff headings at issue, and the court concludes that the

Commission's negligibility determination is in accordance with the law.

**CONCLUSION**

For the foregoing reasons, the court concludes that: (1) the Commission's findings

regarding the volume of subject imports is supported by substantial evidence; (2) the

Commission's findings regarding price effects was supported by substantial evidence and in

accordance with the law; (3) the Commission's findings regarding the impact of subject imports

was supported by substantial evidence and in accordance with the law; and (4) whether the

Commission's determination that Poland was not a negligible source of subject imports was

supported by substantial evidence and in accordance with the law.

Judgment will be entered accordingly.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated: May 17, 2019
New York, New York